IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BARRY TRAEGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 05337 |
| v. ) | |
| ) | |
| AMERICAN EXPRESS BANK FSB, ) | Judge John J. Tharp, Jr. |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

On July 26, 2013, Plaintiff Barry Traeger ("Traeger") commenced this suit against American Express Bank FSB ("American Express") by filing a complaint with this Court alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b). Dkt. 1 at 4-5. Traeger alleges that American Express falsely reported an unpaid credit card debt as Traeger's personal obligation rather than the corporate obligation of his father's company, Traeger Furs, Inc. ("Traeger Furs"). *Id.* Before the Court is a motion to compel arbitration and stay proceedings pending arbitration brought by American Express. Dkt. 29. For the reasons discussed below, the motion to compel arbitration is granted. The proceedings in this Court are accordingly stayed pending arbitration.

## RELEVANT FACTS[1]

Barry Traeger is an individual residing in Illinois. Dkt. 1 at ¶ 4. Traeger Furs, Inc., an

---

[1] In addition to the pleadings, and because a motion to compel arbitration is akin to an assertion that the court lacks subject matter jurisdiction, the Court may consider exhibits and affidavits regarding the arbitration agreement in question. *See, e.g., Reineke v. Circuit City Stores, Inc.*, No. 03 C 3146, 2004 WL 442639, at *1 (N.D. Ill. Mar. 8, 2004) (Pallmeyer, J.); *Corrigan v. Domestic Linen Supply Co., Inc.*, 12 C 0575, 2012 WL 2977262, at *1 (N.D. Ill. July 20, 2012) (Gettleman, J.).

1

Illinois corporation, was chartered on October 30, 1972, and dissolved on September 13, 2011. *Id.* at ¶ 10. The president of Traeger Furs was Barry Traeger's father, Arnold Traeger. *Id.* Traeger Furs was located at 7941 Lincoln Avenue in Skokie, Illinois and it had an American Express account, beginning in 1977. *Id.*; Dkt. 34 at 3. Barry Traeger was apparently an employee of Traeger Furs during the period of the events at issue in this case.

In 2008, someone at Traeger Furs applied for American Express cards for certain Traeger Furs employees, including Barry Traeger. *Id.* According to an affidavit submitted by an assistant custodian of records at American Express, Stephanie Fogelman (the "Fogelman Affidavit"), Traeger contacted American Express in April 2008 to apply for a SimplyCash credit card account; the account was opened and Traeger was mailed a credit card and a Cardmember Agreement.[2] Dkt. 29-1 at ¶ 11. Also according to the Fogelman Affidavit, Traeger began to use the account and credit card and continued that use until at least October 2010. *Id.* at ¶ 12. Further, Traeger responded to monthly statements from American Express by making payments on the account. *Id.* at ¶ 14. The account was closed on October 4, 2011. *Id.* at ¶ 16.

The Cardmember Agreement, sent to Traeger in 2008, contained the following relevant provisions:

---

[2] Traeger maintains that someone else may have applied for the card in his name. Dkt. 1 at ¶¶ 11-13; Dkt. 34 at 3. The Fogelman Affidavit, however, avers that "On or about April 18, 2008, Traeger contacted FSB by telephone to apply for a SimplyCash credit card account issued by FSB." Dkt. 29-1 at ¶ 11. Fogelman's conclusion is based on the fact that the "telephonic application taken from Traeger … was recorded contemporaneously in American Express's records" (*id.*) and that record purportedly shows inputs of information specific to Barry Traeger, such as his name, date of birth, home phone number, and home address. Dkt. 29-3 at 1-2. In any event, the identity of the individual who supplied Traeger's information to American Express is not material to resolution of this motion. What is relevant is that the card was issued in Barry Traeger's name, American Express listed Traeger on statements for the card (which Traeger does not dispute), and the Cardmember Agreement and monthly statements were mailed to "Barry Traeger."

When you keep, sign or use the Business Card issued to you … or you use the account associated with this Agreement (your 'Card Account'), you agree to the terms of this Agreement.

The words 'you,' 'your' and 'yours' mean the person named on the Business Card and/or, where applicable, the Company.

You will be called a 'Business Cardmember' or 'Additional Cardmember.' The Basic Cardmember is the authorizing officer of the Company who authorized us to issue the Business Card to you by signing the Company's application for the Card Account.

The Company, Basic Cardmember, and Additional Cardmembers agree, both jointly and individually, to be bound by the terms of this Agreement.

You promise to pay all Charges, including Charges incurred by Additional Cardmembers, on your Account.

The Company and the Basic Cardmember are responsible under this Agreement for all use of the Card Account by the Basic Cardmember and Additional Cardmembers, and by anyone else the Basic Cardmember or an Additional Cardmember lets use the Card, and the Charges they incur will be billed to the Basic Cardmember.

We will send bills for all Charges to the then current Basic Cardmember for the Card Account or such other person designated by the Company to receive the bills …

As used in this Arbitration provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above agreements … except for the validity, enforceability or scope of this Arbitration Provision or the Agreements.

Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision …

If arbitration is chosen by any party with respect to a claim, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim.

> This Agreement and your Account, and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah (without regard to internal principles of conflicts of law), and by applicable federal law. We are located in Utah, hold your Account in Utah, and entered into this Agreement with you in Utah.

Dkt. 29-2 at 1, 3, 4.

A Notice of Changes to Your Account was sent to Traeger in November 2009, and it contained the following relevant provisions:

> We want to remind you that this account is for business use. Both you and the company are responsible for Charges on the account.
>
> We are adding the following new Joint Liability section immediately after the Promise to Pay section of your Agreement:
>
> Joint Liability – The Company and the Basic Cardmember are jointly and individually liable for all Charges owed on the Card Account. We may enforce any right or remedy we may have against the Company, the Basic Cardmember or any Additional Cardmembers under this Agreement without affecting our other rights or remedies.

Dkt. 29-4 at 7.

A rewritten Cardmember Agreement was sent to Traeger in June 2011, and it contained the following relevant provisions:

> Except as provided below, Basic Cardmember means the person who applied for this Account or to whom we address billing statements. Company means the business for which the Account is established, You and your mean the Basic Cardmember and the Company. You agree, jointly and severally, to be bound by the terms of this Agreement.
>
> You must tell us if the Basic Cardmember is no longer an employee or officer of the Company or does not want to be the Basic Cardmember. In that case, you must either close the Account, or propose another person to replace the Basic Cardmember.
>
> If you propose another person to replace the Basic Cardmember,

> that person must agree to assume the obligations and liabilities of the Basic Cardmember under this Agreement, as of the date that such person replaces the Basic Cardmember.
>
> We may choose to delay enforcing or to not exercise rights under this Agreement. If we do this, we do not waive our rights to exercise or enforce them on any other occasion.
>
> As used in this Arbitration provision, the term *claim* means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above agreements, except for the validity, enforceability or scope of this Arbitration provision.
>
> Utah law and federal law govern this Agreement and the Account. They govern without regard to internal principles of conflicts of law. We are located in Utah. We hold the Account in Utah. We entered into this Agreement with you in Utah.
>
> Any claim shall be resolved, upon the election by your or us, by arbitration pursuant to this Arbitration provision …

Dkt. 29-6 at 5, 9-10 (emphasis in original).

## PROCEDURAL HISTORY

In 2012, American Express filed a lawsuit in the Circuit Court of Cook County against Barry Traeger and Traeger Furs, Inc. Dkt. 1-1 at 6. American Express alleged that an account held by Traeger and Traeger Furs carried an unpaid balance and sought a total judgment of $13,220.17, plus court costs, against both Traeger and Traeger Furs. *Id.* at 7. Traeger filed a motion to dismiss, arguing that the only basis for his personal liability for the unpaid balance was that American Express put his name on the account statements that it sent to Traeger Furs. *Id.* at 38. Ultimately, American Express voluntarily dismissed Traeger from the suit without prejudice and obtained a judgment against Traeger Furs. Dkt. 34 at 4.

Soon after, Traeger demanded that Equifax, Experian, and Trans Union, three credit

reporting agencies, delete from any of his credit reports "any reference to an alleged delinquent debt owed to American Express … This debt is the sole responsibility of Traeger Furs, Inc." Dkt. 1-1 at 56. Traeger twice renewed his demand to the credit reporting agencies. *Id.* at 59, 68.

Traeger brought the present claim in federal court on July 26, 2013. He alleges that American Express continued to report to credit reporting agencies that Traeger was personally responsible for the Traeger Furs debt, in violation of the Fair Credit Reporting Act. Dkt. 1 at ¶ 18, 20-21. Traeger further alleges that as of May 2013, TransUnion and Equifax were still reporting the disputed debt on his credit report. *Id.* at ¶ 26.

## ANALYSIS

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, states that as a matter of federal law, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act further requires courts to stay or dismiss proceedings and to compel arbitration if an issue in controversy is covered by a valid arbitration agreement. 9 U.S.C. §§ 3, 4. There is a presumption in favor of arbitrability and "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

To compel arbitration, this Court must find (1) that a written arbitration agreement exists between the parties; (2) that there is a dispute among the parties within the scope of the arbitration agreement; and (3) that one of the parties is refusing to comply with the arbitration agreement by declining to participate in arbitration. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005). Only the first two issues are disputed; Traeger has declined to participate in arbitration with American Express, a position made obvious by his opposition to

the motion to compel arbitration presently before this Court.

## I. A Binding and Enforceable Arbitration Agreement Exists Between Traeger and American Express.

Traeger does not dispute that the Cardmember Agreement constituted a valid agreement between American Express and Traeger Furs. He instead contends that he was not a party to that agreement, and therefore the agreement's arbitration provision does not apply to him.

### A. Illinois Law Governs the Question of Whether Traeger is a Party to the Cardmember Agreement.

To determine whether an arbitration agreement exists between Traeger and American Express, the Court must look to the state law that ordinarily governs the formation of contracts. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see also Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 806 (7th Cir. 2003) (whether the parties agreed to arbitrate is a matter of state contract law).

American Express asserts that Utah law governs this question because there is a choice of law provision in the 2008 and 2011 agreements stating that Utah law governs the Agreement, but as Traeger correctly notes that approach puts the cart before the horse. The choice of law provision in the Agreement only governs this dispute if Traeger was a party to that Agreement, which Traeger vehemently contests. Instead, Traeger argues, correctly, that the choice of law rules of the forum state (Illinois) govern the identification of the state law applicable to the question of whether a contract exists between Traeger and American Express. *See Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995) (a district court applies the choice of law rules of its forum state); Dkt. 34 at 5. Illinois courts adhere to the "most significant contacts" test to determine which law applies in a contractual dispute. *See P.S. & E. Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th Cir. 1972). According to the Seventh Circuit,

> Illinois has adopted the "most significant contacts" test proffered by the Restatement (Second) of Conflicts § 188 (1971) in deciding choice-of-law disputes with respect to contractual issues. *Ruiz v. Blentech Corp.*, 89 F.3d 320, 323–24 (7th Cir.1996); *Wildey v. Springs*, 47 F.3d 1475, 1481–83 (7th Cir.1995). Under this test, "the contacts relevant to the choice-of-law decision include 'the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and business of the parties.'" *Wildey*, 47 F.3d at 1483 (quoting *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1109–10 (7th Cir. 1987)).

*Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). "The place of contracting is the jurisdiction wherein is accomplished the last act necessary to give validity to the contract." *Ill. Tool Works v. Sierracin Corp.,* 134 Ill. App. 3d 63, 69 (1985). Since the contract could not have been completed until Traeger, located in Illinois, received the Cardmember Agreement and used the card, Illinois is the place of contracting. The applicable factors otherwise split evenly between Utah and Illinois,[3] so the fact that the contract was made in Illinois tips the scale to Illinois law.

### B. Under Illinois Law, Traeger Is Party to the Cardmember Agreement.

Under Illinois law, the issuance of a credit card does not create a contract but is only an offer to extend credit. Consequently, a contract is not formed at the time of the issuance of the credit card; rather, a separate contract is created each time the card is used according to the terms of the Cardmember Agreement at the time of such use (assuming such terms have been communicated to the cardholder). *See Capital v. Antaal,* 2012 IL App (2d) 110904, at ¶¶ 32, 35

---

[3] The plaintiff and the defendant are domiciled in Illinois and Utah, respectively. To the extent that there were any negotiations over the contract, each party negotiated the contract from their respective states. Similarly, the parties performed in their own states. The subject matter of the Agreement can be defined variously as the terms of credit extended to the user, or the "Business Card," or the Account, or all of the foregoing; while the account itself might be said to be located in Utah (that is what the Agreement itself says), the Business Card was used and held in Illinois.

(July 11, 2012); *Hany v. General Electric Co.,* 221 Ill. App. 3d 390, 396 (1991); *Garber v. Harris Trust & Savings Bank,* 104 Ill. App. 3d 675, 678-80 (1982). Traeger states that he does not recall receiving or reading the agreements, but does not dispute that the Cardmember Agreement and subsequent amendments were sent to him. Dkt. 34-1 at ¶ 8-9. His use of the card therefore subjected him, under Illinois law, to the terms of the Cardmember Agreement in effect at the time he used the card.

Traeger argues that the Illinois Statute of Frauds bars enforceability of the Cardmember Agreement, but he raises that argument in an effort to avoid the application of Utah law. As noted, he's already won that battle, but it does not help him win the war given the holdings of *Garber* and its progeny that the Cardmember Agreement is enforceable under Illinois law. In any event, Traeger's statute of frauds argument fails for two other reasons. First, it depends on a characterization of the statute of frauds as procedural, rather than substantive,[4] and the Seventh Circuit has previously concluded that, while procedural in form, the statute's purpose is substantive and it should be treated as such when resolving questions of applicable law. *See Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1181-82 (7th Cir. 1991).[5]

Second, by its terms, the statute of frauds does not bar enforcement of the Cardmember Agreement. Only a "special" promise to answer for the debt of another is subject to the statute of

---

[4] Traeger argues that, as a procedural rule, the statute applies because procedural rules of the forum state apply.

[5] Contrary to Traeger's suggestion, the Illinois Supreme Court did not hold otherwise in *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482 (1997). In *McInerney*, the Illinois Supreme Court stated that the statute of frauds "functions more as an evidentiary safeguard than as a substantive rule of contract." *Id.* at 489. The Court did not address, however, the question of how the statute should be treated in a choice-of-law context, and is therefore not inconsistent with *Monetti* (where, it is worth noting, the Seventh Circuit made a similar observation that the statute of frauds functions as an evidentiary safeguard). 931 F.2d at 1181 (the statute's "main proximate goal is evidentiary").

9

frauds, and only a "collateral" promise is a "special" promise. In other words, an original or independent promise is *not* a special promise under the statute of frauds. *See Villarreal v. Metropolitan Bank and Trust Co.*, 227 Ill. App. 3d 188, 192 (1st Dist. 1995). Viewed another way, a contract for suretyship (a collateral promise to pay the debt of another) is within the statute of frauds, *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 226 Ill. 2d 559, 567 (2007), but the putative contract here is not a contract for suretyship or otherwise a collateral promise. Under its terms, Traeger was an original obligor, not a surety for the obligations of Traeger Furs, so the statute of frauds is inapplicable to the Cardmember Agreement. Thus, there was no requirement that Traeger sign a document memorializing his agreement to the terms of the Cardmember Agreement.[6]

Perhaps recognizing this problem, Traeger asserts that authorized users of credit cards are agents of the principal and are generally deemed not to be liable for the principal's debts. *See* Dkt. 34 at 6 (citing cases). There are at least two problems with this argument. First, Traeger fails to cite any cases based on Illinois law for this proposition. And second, even if he could, the argument ignores the fact that he is not just an "authorized user" of a credit card issued to Traeger Furs, Inc. Based on the terms of the Cardmember Agreement, he is jointly and severally responsible for the charges on the account. The language of the Cardmember Agreement

---

[6] Viewed yet another way, it cannot be said that Traeger's "main purpose" in agreeing to answer for the debts on the Traeger Furs account was to further his own economic interests. *See Rosewood Care Center,* 226 Ill. 2d at 572-73. There is no dispute that the card was a business card; indeed, Traeger's principal contention is that the card wasn't issued to him but to the business ("The account agreement … plainly contemplates that the account is that of an entity"). Dkt. 34 at 6. Questions about the purpose and formation of a suretyship agreement are generally fact issues, and under § 4 of the FAA, a trial may be required to resolve material questions of fact regarding the existence of a written arbitration agreement, but given Traeger's admissions regarding the business nature of the card, no reasonable jury could find that Traeger accepted the terms of the agreement primarily to advance his own personal economic interest rather than that of the company.

distinguishes this situation from those in the cases on which Traeger relies and, as American Express demonstrates in its brief, an agreement should be enforced as written. Dkt. 35 at 8-9. *See Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) ("The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the rights of the parties.") (quoting *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998)).

Turning then to the text of the Cardmember Agreement, the original 2008 Cardmember Agreement ("the 2008 agreement") defined "you" as "the person named on the Business Card and/or, where applicable, the Company." Dkt. 29-2 at 1. The agreement continued, "**You** promise to pay all Charges …" *Id.* (emphasis added). It further stated, "The Company, Basic Cardmember and Additional Cardmembers agree, both jointly and individually, to be bound by the terms of this Agreement." *Id.* Account documents provided to this Court by American Express identify Traeger as "On Card." Dkt. 29-3 at 1. Further, the agreement stated, "We will send bills for all Charges to the then current Basic Cardmember for the Card Account or such other person designated by the Company…"). The June 2011 revised agreement ("the 2011 agreement") stated,

> Except as provided below, Basic Cardmember means the person who applied for this Account or to whom we address billing statements. Company means the business for which the Account is established, You and your mean the Basic Cardmember and the Company. You agree, jointly and severally, to be bound by the terms of this Agreement.

Dkt. 29-6 at 5. As to either the 2008 or the 2011 agreement, Traeger is a party. He is listed as the only individual "on card" and on the sample billing statement provided to this Court by American Express. Dkt. 29-3 at 1; Dkt. 29-4 at 1. The 2008 agreement clearly identifies "you" as the "person named on the Business Card," which is Barry Traeger. Dkt. 29-2 at 1; Dkt. 29-3 at 1.

Further, Traeger Furs, the Basic Cardmember, and any Additional Cardmember "agree, both jointly and individually, to be bound by the terms of the Agreement." Dkt. 29-2 at 1. The 2011 agreement is actually addressed to him ("Dear Barry Traeger;" "[W]e've rewritten your Cardmember Agreement;" "We've enclosed your new Cardmember Agreement, where you can find information about how your account works;" "Cardmember Name: Barry Traeger"). Dkt. 29-5 at 9; 29-6 at 1. In sum, the Court finds that the unambiguous language of the 2008 and 2011 agreements makes it clear that Traeger is a party to the Cardmember Agreement.

### C. The Arbitration Provision is Binding and Enforceable.

Having determined that Traeger is a party to the Cardmember Agreement, the question becomes whether the agreement's arbitration provision is binding and enforceable. The 2008 and 2011 agreements contain identical and explicit arbitration provisions. The 2008 agreement provides:

> Any claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration provision …

Dkt. 29-2 at 3; Dkt. 29-6 at 10. The 2011 agreement provides:

> Any claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration provision …

Dkt. 29-6 at 9-10. The Cardmember Agreement's choice of law provision applies to the interpretation of the agreement's provisions, so Utah law governs this question, but there is no difference on this score between Utah and Illinois law in any event; under either state's law, the arbitration provision in the 2011 agreement is binding on Traeger and American Express and enforceable. *Compare* U.C.A. 1953 § 78B-11-107 (eff. Feb. 7, 2008) ("Validity of agreement to arbitrate") ("An agreement contained in a record to submit to arbitration … is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a

contract.") *with* 710 ILCS 5/1 (eff. Sept. 22, 1977) ("Validity of arbitration agreement") ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy … is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract …"). *See also Sosa v. Paulos*, 924 P.2d 357, 359 (Utah 1996) ("arbitration agreements are favored in Utah … they are enforceable if they meet the standards applicable to all contracts"); *ACME-Wiley Holdings, Inc. v. Buck*, 343 Ill. App. 3d 1098, 1103 (2003) ("The Illinois Uniform Arbitration Act … embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes.").

In sum, both the 2008 and 2011 agreements contain an explicit arbitration agreement that is binding and enforceable on the parties to the agreement, Traeger and American Express.

**II.     The Dispute Falls within the Scope of the Arbitration Agreement.**

The question of whether a particular issue is subject to arbitration is a matter of contract interpretation. *See Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). In particular, the phrase "arising from or relating to" is common in arbitration clauses; the Seventh Circuit has held that arbitration clauses that contain this language are "broad" and "necessarily create a presumption of arbitrability." *Kiefer*, 174 F.3d at 910.[7]

The 2011 revised Cardmember Agreement provides:

---

[7] The language in the 2008 (but not the 2011) agreement expressly excludes disputes about "the validity, enforceability or scope of this Arbitration Provision or the Agreements." Dkt. 29-2 at 3. That fact likely explains why American Express does not argue that the Cardmember Agreement requires submission of issues regarding the scope of arbitration (*i.e.*, who decides arbitrability) to the arbitrator. *See generally First Options*, 514 U.S. at 943 ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter.") (emphasis in original; internal citations omitted). Accordingly, the Court takes up the question of whether the present dispute is within the scope of the arbitration provision of the Cardmember Agreements.

> Any claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration provision …
>
> [T]he term *claim* means any claim, dispute or controversy between you and us **arising from or relating to your Account, this Agreement,** the Electronic Funds Transfer Services Agreement, **and any other related or prior agreement that you may have had with us**, or the relationships resulting from any of the above agreements, except for the validity, enforceability or scope of this Arbitration provision.

Dkt. 29-6 at 9-10 (emphasis added).

Both the 2008 and 2011 agreements contain the broad "arising from or relating to" language. Further, although Traeger has brought a claim under the Fair Credit Reporting Act, this does not disconnect his claim from the reach of the arbitration clause in the 2011 agreement. In *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993), for example, the Seventh Circuit noted that "any dispute between contracting parties that is *in any way connected with their contract* could be said to 'arise out of' their agreement and thus be subject to arbitration." *Id.* at 642 (citation omitted). Traeger's claim that American Express provided false information to credit reporting agencies when the agencies sought to verify the disputed debt on the Traeger Furs/Traeger account is inextricably "connected to" the agreement at issue. Traeger's claim, in fact, relies exclusively on his belief that he is not personally liable under his interpretation of the agreement. That is a question to be resolved in arbitration, but at this juncture, the claim is subject to the arbitration provision in the agreement.

### III.  American Express Did Not Waive Its Right to Arbitrate this Dispute.

Traeger argues that American Express waived any right to arbitrate by filing a lawsuit in the Circuit Court of Cook County and by obtaining a judgment in that court against Traeger Furs. Dkt. 34 at 11. A contractual right to arbitrate may be waived, either expressly or implicitly. *See Cabintree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995).

Traeger does not argue that American Express explicitly waived its right to arbitrate, so this Court will evaluate whether waiver by American Express can be inferred.

For waiver to be inferred, the Court must determine, considering the totality of circumstances, whether American Express acted inconsistently with the right to arbitrate. *See Kawasaki Heavy Industr., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011) (citing *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004)). Several factors should be considered, including diligence or the lack thereof and whether American Express participated in litigation, substantially delayed its request for arbitration, or participated in discovery. *See id.* A showing of prejudice is not required in this Circuit, although it is still a relevant factor. *See id.*

Traeger argues that the participation by American Express in the state court litigation shows waiver of its right to arbitrate. It is true that a court must presume that a party implicitly waives its right to arbitrate when it chooses a judicial forum for the resolution of a dispute. *See Cabintree*, 50 F.3d at 390; *see also Grumhaus v. Comerica Securities, Inc.*, 223 F.3d 648, 650 (7th Cir. 2000). Participation in litigation is a relevant factor so that the proper forum for a dispute is established early and so that parties are prevented from waiting to see how they fare in a judicial forum before choosing arbitration. *See Kawasaki*, 660 F.3d at 994-95. "The key determination when considering this factor … is whether a party manifested an intent to proceed with litigation." *Id.* at 995 (citing *Cabintree*, 50 F.3d at 390).

It would be difficult to construe American Express's initiation of litigation in state court to collect the debt owed on the Traeger Furs account as anything other than a waiver of its right to arbitrate its claim *to collect that debt*. But that is not the claim at issue in this case. In this suit, American Express is asserting no claim against Traeger; rather, Traeger sued American Express,

15

alleging a violation of the FCRA. For reasons discussed above, that claim "arises under" the Cardmember Agreement, but it cannot be said that American Express waived its right to arbitrate that claim when it sought to collect the debt on the account. *See, e.g., Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 332 (7th Cir. 1995) (holding that a decision to litigate state law breach of contract claims did not evince an intent to waive arbitration of federal Lanham Act claims because the two claims "involved different issues"); *see also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir. 1997) ("[O]nly prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate."); *cf. Grumhaus*, 223 F.3d at 652 ("when the same issues are presented, a party may not escape the effect of its waiver by minimally restyling the claim and presenting it for arbitration").

American Express has not proceeded with any litigation in a manner inconsistent with its intent to arbitrate the current dispute that Traeger has brought under the Fair Credit Reporting Act. *See Kawasaki*, 660 F.3d at 996. Further, American Express has not delayed in expressing its desire to arbitrate, nor has it participated in litigation of the present dispute or shown a lack of diligence in proceeding towards arbitration. *See id.* at 994. American Express, therefore, has not waived its right to arbitrate.

**IV.     American Express is Not Judicially Estopped from Arguing that Traeger is Jointly and Severally Obligated Under the Cardmember Agreement.**

Traeger argues that the principle of judicial estoppel requires the rejection of American Express's argument that "the FSB credit card was issued in the name of Traeger, an individual, not the corporation." Dkt. 34 at 4. Traeger claims that American Express benefitted in state court from its position that Traeger Furs was accountable for the debt, and that it should not now benefit from (according to Traeger), an inconsistent argument that Traeger himself is accountable for the debt. *Id.* American Express counters that its current position is "entirely

consistent" with its position in the state court lawsuit against Traeger and Traeger Furs. Dkt. 35 at 3. American Express explains that in state court, it alleged that the credit card account was in Traeger's name and that Traeger and Traeger Furs were jointly and severally obligated under the terms of the Cardmember Agreement. *Id.* at 3-4.

Three factors "typically inform the decision whether to apply the doctrine [of judicial estoppel] in a particular case." *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)). They are: (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 721-22 (citing *New Hampshire*, 532 U.S. at 750-51). As American Express explains, its current position is consistent with its position in the state court litigation. American Express pursued both Traeger and Traeger Furs in state court, relying on a theory that both were accountable for the debt on the card. Dkt. 1-1 at 6 (Verified Complaint) ("That at all times relevant Defendant [Traeger and Traeger Furs] was a cardmember and thus responsible for paying all amounts charged to the Account"). Although American Express voluntarily dismissed Traeger from the lawsuit, and obtained a default judgment against Traeger Furs, it did so without prejudice so that it could preserve its claim against Traeger for the future, if necessary. In other words, American Express has not taken a "clearly inconsistent" position in the current lawsuit compared to its position in state court; it has consistently taken the position that both Traeger Furs and Traeger were accountable for the debt. As Traeger has not shown the first of the three judicial estoppel

factors, his judicial estoppel argument fails.

*  *  *

For the reasons discussed above, the Court grants the defendant's motion to compel arbitration. The Court further stays the case pending arbitration. *Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir. 2002) (when a district court refers a dispute for arbitration, "the district judge should … stay[] it to await the outcome of arbitration … rather than dismiss" the case).

Date: January 30, 2014

John J. Tharp, Jr.
United States District Judge